1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OCTAVIO J. HENDERSON,<br><br>               Plaintiff,<br><br>     v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>               Defendant.<br>_____/ | Case No.  1:14-cv-01161-LJO-SKO<br><br>**FINDINGS AND RECOMMENDATIONS THAT THE ALJ'S DECISION BE AFFIRMED AND JUDGMENT BE ENTERED FOR DEFENDANT**<br><br>**OBJECTIONS DUE:  14 DAYS** |

## INTRODUCTION

Plaintiff Octavio J. Henderson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act").  42 U.S.C. §§ 1381-83.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.

For the reasons set forth below, the undersigned RECOMMENDS that the ALJ's decision be REVERSED and REMANDED for further administrative proceedings and that judgment be entered for Plaintiff and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

**BACKGROUND**

Plaintiff was born on July 21, 1970, and he completed a General Education Degree certificate in 1998.  (AR 43, 210.)  He previously worked as a truck driver, a dock loader, a cook, and a mental health counseling aid.  (AR 210-11.)  He stopped working in November 2006 because the company he worked for closed down, but he believes his conditions caused him to become disabled one month after he was laid off.  (AR 210.)  Plaintiff alleges disability due to limited movement in his back, hip, and lower leg; lumbago; numbness in legs and hips; and asthma.  (AR 209.)

**A.      Relevant Medical Evidence**

**1.      Physical Medical Evidence**

In December 2008, Plaintiff was examined by Young W. Park, M.D.  (AR 314.)  Plaintiff's problems were limited to asthma and lumbago, and no other complaints were noted.  (AR 314.)  In December 2009, Plaintiff told Dr. Park he was experiencing back spasms and tenderness. (AR 309.)

In February 2010, Plaintiff underwent a lumbar spine x-ray, which showed partial sacralization of L5 on the left, but the posterior elements and joints were otherwise normal as were disc spaces and sacroiliac joints.  (AR 313.)  In March 2010, Plaintiff again reported back spasms and tenderness to Dr. Park.  (AR 308.)

In April 2010, Plaintiff was seen by Jay H. Yoo, M.D., at a rehabilitation and pain clinic. (AR 416-17.)  Plaintiff reported a two-year history of severe low back pain radiating down his right leg for which he had been taking Vicodin and Soma.  (AR 416.)  He underwent a lumbar spine x-ray in February 2010 which revealed normal disc space, but there was partial sacralization of the L5 on the left.  (AR 416.)  Dr. Yoo noted that while Plaintiff did not use any assistive devices, he had a severe limping gate.  (AR 416.)  On examination, a straight-leg raising test showed severe back pain elicitation, but there was no significant tenderness over the lower lumbar area.  (AR 416.)  Dr. Yoo recommended a magnetic resonance imaging ("MRI") scan of the lumbar spine, and he replaced Plaintiff's Vicodin prescription with Lortab.  (AR 417.)

An MRI of Plaintiff's lumbar spine was obtained on June 1, 2010.  (AR 334.)  The radiologist provided the following impression:

1.  There is congenitally narrow AP diameter of the lumbar spinal canal.
2.  There is a ventral and left-sided disc extrusion at L4-5 measuring 5 to 6 mm in size resulting in moderate to severe canal and bilateral foraminal stenosis.
3.  There is mild to moderate canal and bilateral foraminal stenosis at L2-3 and L5-S1.
4.  There is mild canal and mild to moderate bilateral foraminal stenosis at L3-4.

(AR 334.)

Plaintiff saw Dr. Yoo again on July 9, 2010.  (AR 414-15.)  Dr. Yoo indicated the MRI scan from April showed ventral and left-sided disc extrusion at L4-L5 measuring 5 to 6 mm in size and resulting in moderate to severe canal and bilateral foraminal stenosis.  (AR 414.)  He recommended Plaintiff continue with gentle home exercises for stretching and ambulation, and he refilled Plaintiff's prescription for Lortab.  (AR 414.)  No review of the June 2010 MRI was noted.

In September 2010, a physical examination note from George T. Bella, M.D., indicated Plaintiff was out of all his pain medication, and he was reporting feelings of fatigue.  (AR 351.)  Plaintiff's physical activity was noted to be normal.  (AR 351.)  In November 2010, Plaintiff saw Dr. Bella and complained he was not sleeping well and was experiencing mood swings.  (AR 342.)  He was referred to Ashok M. Parmar, M.D.

On December 17, 2010, Plaintiff was seen for a comprehensive initial pain management consultation with Dr. Parmar.  (AR 347-50.)  Dr. Parmar indicated he reviewed Plaintiff's June 2010 MRI, which showed congenitally narrow AP diameter of the lumbar spinal canal, lumbar spinal stenosis at multiple levels, and a 6mm disc extrusion at L4-L5.  (AR 347.)  Plaintiff reported he had undergone physical therapy without pain relief, but he denied any interventional procedure for his pain or surgery.  (AR 347.)  Plaintiff reported his pain level at an 8 to 10 out of 10 that worsened with prolonged sitting, standing, walking, and coughing.  (AR 347.)  Plaintiff also reported the pain interfered with his sleep.  (AR 347.)  Dr. Parmar noted Plaintiff was negative for a history of depression or anxiety.  (AR 348.)  Upon examination, Dr. Parmar recommended Plaintiff undergo a series of three lumbar epidural injections under fluoroscopy to relieve the back pain and radicular symptoms.  (AR 350.)

3

On February 7, 2011, Plaintiff was seen by state agency physician Juliane Tran, M.D., for a comprehensive orthopedic evaluation.  (AR 318-21.)  Plaintiff reported back pain since 2000 after having picked up a heavy box.  (AR 318.)  Plaintiff reported he was scheduled for a lumbar epidural injection, but he had not had the procedure yet.  (AR 318.)  He indicated his back pain radiated to his upper left leg, and he could walk no more than a half block to one block due to pain.  (AR 318.)  On examination, the straight leg raising test was negative in the seated position, and his pain presented without radicular symptoms.  The Piriformis test and the Faber's test were both negative.  (AR 320.)  Dr. Tran indicated Plaintiff's back pain was likely due to lumbar degenerative disc disease, but he had no lumbar sacral radiculopathy and a normal sensory exam with symmetrical reflexes.  (AR 320.)  Dr. Tran opined Plaintiff was limited to lifting no more than 20 pounds occasionally, and 10 pounds frequently; sitting or standing no more than six hours in a day; was precluded from climbing, balancing, or working at heights; had no visual or manipulative restrictions; was limited to frequent bending and stooping, but was precluded from kneeling and crouching.  (AR 321.)

On February 18, 2011, state agency physician A. Khong, M.D., reviewed Plaintiff's records and completed a physical residual functional capacity form.  (AR 322-26.)  Dr. Khong opined Plaintiff could occasionally lift 20 pounds, and frequently lift 10 pounds; could sit, stand, or walk for approximately six hours in an eight-hour workday; and could occasionally climb stoop, kneel, crouch, and crawl.  (AR 323-24.)

Plaintiff was next seen by Dr. Yoo in December 2011 and reported severe low-back pain with left leg radiation.  (AR 412.)  Dr. Yoo noted Plaintiff had been followed by Dr. Ashok for pain management, but Plaintiff's pain remained between 7 or 8 out of 10, mostly in the left lower back radiating to his left knee.  (AR 412.)  Dr. Yoo recommended Plaintiff continue with Lortab and Soma and that he return in two months for follow-up.  (AR 412.)

In February 2012, Plaintiff was again seen by Dr. Yoo reporting severe pain in his neck through his lower back and left hip.  (AR 410.)  Dr. Yoo wrote a prescription for bilateral axillary crutches and refilled Plaintiff's prescription for Lortab and Soma.  (AR 410.)

Plaintiff followed-up again with Dr. Yoo in April 2012 and reported persistent pain mostly in his legs and lower back.  (AR 409.)  Dr. Yoo refilled Plaintiff's prescription for Lortab and Soma and recommended Plaintiff continue his home exercises and make an effort to lose weight. Plaintiff was to return to the clinic in three months.  (AR 409.)

In an undated form, Dr. Parmar opined Plaintiff could not work; could not stand or sit for more than 15 minutes at a time; could do no lifting whatsoever; and could never bend or manipulate his hands.  (AR 396.)  In the comment section, Dr. Parmar noted Plaintiff suffered from severe low back pain.  (AR 396.)

On November 4, 2011, Dr. Parmar completed a longer form regarding Plaintiff's functional capacity specific to his cervical spine.  (AR 397-401.)  Dr. Parmar opined Plaintiff's diagnosis was lumbar disc protrusion and his prognosis was guarded.  (AR 397.)  Plaintiff had significant limitation of motion, and he could sit, stand, and walk less than two hours per day.  (AR 398.)  He opined Plaintiff requires a job that permits him to shift between standing, sitting, and walking at will; Plaintiff must use an assistive device when standing or walking; Plaintiff can never lift any weight; Plaintiff can never look down, turn his head right or left, look up, or hold his head in a static position.  (AR 398.)  Dr. Parmar also noted that emotional factors contributed to the severity of Plaintiff's symptoms, and he identified depression and anxiety as emotional conditions that affected Plaintiff.  Oddly, Dr. Parmar checked a box that stated Plaintiff's impairments were not reasonably consistent with the symptoms and functional limitations described; he also noted that Plaintiff's symptoms would never be severe enough to interfere with Plaintiff's attention and concentration to perform simple work tasks.  (AR 399.)  He opined Plaintiff would be incapable of tolerating even "low stress" jobs; Plaintiff should only rarely engage in twisting, stooping, crouching, or climbing ladders or stairs; but Plaintiff had no significant limitations with reaching, handling, or fingering.  (AR 401.)

Dr. Parmar also completed a lumbar spine residual functional capacity questionnaire. (AR 402-06.)  Like Plaintiff's cervical spine impairments, Dr. Parmar noted Plaintiff's lumbar impairment was affected by emotional factors such as anxiety, but he also noted that Plaintiff's pain or symptoms would never be severe enough to interfere with the attention and concentration

needed to perform simple work tasks.  (AR 403.)  He opined Plaintiff could not lift any amount of weight, he should never twist, stoop, crouch, climb ladders or stairs, but he also checked a box indicating Plaintiff would never miss work as a result of his impairments or treatment.  (AR 405.)[1]

### 2.      Mental Health Medical Evidence

In January 2011, Plaintiff contacted a crisis hotline requesting mental health services.  (AR 353.)  He reported back pain and indicated he had never received any mental health treatment; he self-medicated his symptoms with marijuana and "meth."  (AR 353.)  The intake worker reported Plaintiff was tearful and paranoid but receptive to mental health intervention.  (AR 353.)  Plaintiff was referred to Oildale Community Health Clinic ("Oildale"), and an appointment was set for February 1, 2011.  (AR 353.)  On March 8, 2011, a treatment note from Oildale Community Health Clinic indicated Plaintiff was seen for an episodic mood disorder.  (AR 364.)  Plaintiff reported he was having difficulty falling asleep, he was moody, and he had difficulty getting out of bed.  (AR 364.)  Plaintiff reported he was independent and was able to complete tasks, but noted he was going through pain management for back problems.  (AR 364.)  Plaintiff reported he completed high school and took two years of college courses in family psychology, but he discontinued school when he began working.  (AR 364.)

Plaintiff was seen again at Oildale on March 30, 2011.  (AR 361.)  He reported recurrent anxiety, poor sleep, and aches and pains; he was observed to be inattentive, irritable, and distracted.  (AR 361.)  Plaintiff was seen again on April 13, 2011, at Oildale where it was noted his affect and mood were somewhat irritated, but he was properly attired and groomed and made good eye contact.  Plaintiff was seen again on May 23, 2011, and it was noted he showed fair resolve to participate in treatment and had good insight about mental health issues as well as a good sense of judgment.  (AR 358.)

On June 22, 2011, Plaintiff was examined by Nick Garcia, Ph.D.  (AR 368-72.)  His major complaints were back, hip, and left-leg pain; hypertension; and depression.   (AR 368-72.)  Plaintiff was diagnosed with depression and was reportedly taking Depakote, Risperdal, Trazedone, and Divalproex.  (AR 369.)  At that time, Plaintiff was able to perform light chores,

---

[1] Dr. Parmar's check-box opinions are internally inconsistent.

but he relied on his girlfriend to take care of the finances.  He was also able to drive, cook, and grocery shop with the assistance of a wheelchair.  (AR 369.)  Plaintiff's gait and posture were noted to be unremarkable.  Dr. Garcia opined Plaintiff appeared to have moderate emotional and behavioral problems which would impede his ability to socialize with others and impede his ability to take care of his self-care needs.  He also opined Plaintiff demonstrated no deficits with regard to persistence, pace, or concentration; but he appeared to have moderate emotional and behavioral problems that would impede his ability to interact with co-workers in a competitive job situation.  (AR 372.)

On August 2, 2011, state agency physician J. K. Martin, M.D., reviewed Plaintiff's medical records and completed a mental residual functional capacity form.  (AR 378-80.)  Dr. Martin found Plaintiff moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (AR 378-80).  Dr. Martin found Plaintiff markedly limited in his ability to interact appropriately with the general public.  (AR 379.)  In the narrative portion of the form, Dr. Martin provided the following RFC opinion:

> [Plaintiff is] [c]apable of understanding, remembering and carrying out simple instructions over the course of a normal workweek without extra supervision.  Affective symptoms would impose difficulty with detailed instructions.  Limited to no public contact and a setting which did not have social interactions as a predominant requirement, limiting interpersonal contact to brief and superficial interactions.  Capable of adapting to changes in a routine setting.
> (AR 380.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 83-89, 94-100.)  On December 10, 2012, the ALJ held a hearing.  Plaintiff testified, through the assistance of counsel, and a Vocational Expert ("VE") testified.  (AR 37-76.)

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified he had a driver's license, but he does not drive because when he sits for longer durations of time the seats become uncomfortable. (AR 43.)  He last worked in 2006 in auto detailing which he did for approximately one month.  (AR 44.)  Before auto-detailing, he worked as a pizza cook for about four or five months.  (AR 44.)  Before that he drove a truck for approximately a year.   (AR 45.)   He also worked with Crestwood Behavioral Health as a counselor.  (AR 45.)  He stopped working in 2006 because his condition was "just getting too bad." (AR 46.)  At the time of the hearing, he could only lift between 10 and 20 pounds and when standing he must lean up against something until he becomes comfortable. (AR 47.)   Without assistance he can walk up to a block or about 10 minutes, and he can sit for about 10 minutes. (AR 47-48.)   He believes the cause of his inability to sit or stand for a longer period stems from his degenerative disc disease.  (AR 53.)

On a typical day, he will have someone assist him with dressing; he has two boys who go to school, and he tries to "accommodate them" if he can; he does very little around the house and his medication causes him to sleep a lot.  (AR 48.)  He does not cook, clean, or grocery shop; he watches television and reads when he is awake.  (AR 49.)  He does no yard work, and he can no longer participate in running as a hobby.  He does not attend his sons' school functions unless it is just for a short period of time.  (AR 50.)  His medications are for hypertension and pain; he also has an inhaler and takes medication for anger, anxiety, cholesterol, and high blood pressure. (AR 51.)   He experiences many side effects, including emotional highs and lows and anger. (AR 51.)  He recalled an event earlier in the year where police officers were called to locate him, and they brought a mental health worker out to the house.  (AR 52.)  In the past, when he was out of medication he obtained a medical marijuana card, but marijuana was not an "everyday thing."

(AR 52.)  The prescription medication makes him drowsy, lethargic, and nauseated; he reported difficulty maintaining motivation.  (AR 54.)  He has asthma attacks when there is a fragrance or the wind blows a certain way; it happens every day.  (AR 55.)  His asthma has resulted in emergency room treatment.

He experiences consistent pain up and down his back and into his neck; he experiences numbness so he has to shift positions frequently.  The cane he uses helps to take off some pressure and provides some relief.  (AR 58.)  At home he supports his leg when he watches television and keeps a pillow behind him to lie on.  (AR 58.)

**2.      Testimony of Vocational Expert**

A Vocational Expert ("VE") also testified at the hearing.  (AR 65-76.)  Plaintiff's past work was characterized as a psychiatric aide, Dictionary of Occupational Titles ("DOT") 355.377-014, which is classified as medium work with an SVP[2] of 4; a truck driver, DOT 905.663-014, which is classified as medium work with an SVP of 4; short order cook, DOT 313.374-014, which is classified as light work with an SVP of 3; and automobile detailer, DOT 915.687-034, which is classified as medium work with an SVP of 2.

The ALJ posed a hypothetical question for the VE to consider.  The ALJ asked the VE to consider a person with the same education, work history, and of the same age as Plaintiff who could lift 20 pounds; complete an eight-hour workday if given the option to alternate between sitting and standing as needed in up to 30-minute increments; who must be in a work environment without dust or environmental pollutants or fumes that would trigger an asthma attack; and who can work in proximity to others, but not as part of a team.  In posing this hypothetical, the ALJ noted the DOT does not discuss a sit/stand option for any jobs it lists and asked the VE whether there was something in the VE's work history that would give him expertise to discuss jobs that provide a sit/stand option.  (AR 69.)  The VE testified he has been a vocational rehabilitation counselor for approximately 24 years, he has completed hundreds of job analyses, and he is in "constant convocation with [his] colleagues regarding this issue."  (AR 70.)  The VE stated an individual limited as posed in the hypothetical would not be able to perform any of Plaintiff's past

[2] SVP refers to the specific vocational preparation needed for a job.  DICOT, App. C, 1991 WL 688702.

relevant work, but there were alternative jobs such a person could perform including ticket seller, DOT 211.467-030; photocopying machine operator, DOT 207.685-014; and office helper, DPT 239.567-010.

Plaintiff's counsel asked the VE whether there would be any environmental restrictions applicable to that alternative work, and the VE responded there would not be environmental hazards at those jobs.  (AR 71.)  Plaintiff's counsel then asked whether the officer worker job could still be performed if the hypothetical person also needed to use an ambulatory device; the VE testified such a person could still perform that work.  (AR 72.)  Plaintiff's counsel also asked if a person was off-task 20 percent of the time because of medications, and he was required to use an inhaler three or four time a day, whether that would impact the person's ability to perform the work identified.  The VE testified that, depending on the work-setting, a person could be off task that long and still perform the work.  On the other hand, an assembly line worker, for example, could not be off task for that amount of time and still perform the work.  (AR 73.)  Plaintiff's counsel then asked the VE to assume a person who was required to keep one leg elevated on a stool to accommodate back pain and who must alternate between sitting and standing in 10- and 5-minute intervals.  The VE testified that only about 25 percent of ticket sellers are required to stand all day, but most places provide a stool and if a person were to bring his or her own stool to elevate a leg that would not be a problem.  (AR 75.)

**5.      The ALJ's Decision**

On January 10, 2013, the ALJ issued a decision, finding Plaintiff not disabled.  (AR 20-31.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since February 26, 2010, the date of Plaintiff's application; (2) has the following severe impairment or a combination of impairments:   degenerative disc disease of the lumbar spine, obesity, asthma, anxiety, personality disorder, and depression; (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is unable to perform his past relevant work; and (5) could perform other jobs in significant numbers in the national economy.  (AR 20-31.)

1    The ALJ determined that Plaintiff has the residual functional capacity ("RFC")[3] to perform

2 light work, but he must be given the option to alternate between sitting and standing as needed in

3 up to 30-minute increments; he cannot work where exposed to dust or pollutants; and cannot work

4 as part of a team but is able to work in proximity to others.  (AR 24.)

5    Plaintiff sought review of this decision before the Appeals Council.  (AR 14-16.)  On May

6 27, 2014, the Appeals Council denied review.  (AR 3-7.)  Therefore, the ALJ's decision became

7 the final decision of the Commissioner.  20 C.F.R. § 404.981.

8                                          **SCOPE OF REVIEW**

9    The ALJ's decision denying benefits "will be disturbed only if that decision is not

10 supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

11 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

12 judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

13 Instead, the Court must determine whether the Commissioner applied the proper legal standards

14 and whether substantial evidence exists in the record to support the Commissioner's findings.  See

15 *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

16 scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

17 Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

18 accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

19 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

20 consider the entire record as a whole, weighing both the evidence that supports and the evidence

21 that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

22 specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

23 2007) (citation and internal quotation marks omitted).

24

25

26    [3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work
setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social

27 Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an
individual's medically determinable impairment or combination of impairments.  *Id.*

28

**APPLICABLE LAW**

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

**A.      ALJ's Consideration of the Medical Evidence**

Plaintiff contends the ALJ erred in considering the opinions of Drs. Garcia and Martin by failing to adopt the limitations they opined Plaintiff suffers with respect to his ability to deal with the public and perform simple, repetitive tasks.

**1.      Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id*. Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id*. If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

**2.      The ALJ's Consideration of Dr. Garcia's Opinion Was Proper**

Plaintiff contends Dr. Garcia made two findings the ALJ erroneously failed to incorporate into the RFC even though the ALJ assigned evidentiary weight to Dr. Garcia's opinion. Dr. Garcia found Plaintiff (1) has moderate emotional and behavior problems that would impede his ability to socialize with others and impede his ability to take care of his self-care needs; and (2) would have moderate emotional and behavioral problems which would impede his ability to interact with co-

1  workers in a competitive job situation.  Plaintiff argues these findings implicate his ability to work

2  with the public, yet no limitation for working with the public was included in the RFC.

3        The Commissioner argues Dr. Garcia did not opine Plaintiff would be unable to interact

4  with co-workers, only that he would be impeded in his ability to socialize with others and interact

5  with co-workers.  There was sufficient evidence that this limitation was not particularly severe in

6  that Plaintiff reported he lived with his roommate and girlfriend, had family and peer interactions,

7  and spent time with his sons.  The ALJ interpreted Dr. Garcia's relatively benign examination

8  findings to mean that Plaintiff would have some difficulty interacting with others, but that he

9  would not be entirely precluded from doing so.  Thus, the ALJ restricted Plaintiff from work as

10 part of a team but found he could work in proximity to others.  This RFC assessment did not

11 ignore Dr. Garcia's opinion.

12       Dr. Garcia found Plaintiff had moderate emotional and behavioral problems that would

13 impede his ability to socialize with others and his ability to interact with co-workers in a

14 competitive job situation.  (AR 372.)  Although Plaintiff argues this should have been construed as

15 a preclusion of any public contact, Dr. Garcia did not opine Plaintiff was unable to interact with

16 others.  The ALJ credited Dr. Garcia's opinion and reasonably translated Plaintiff's "impeded"

17 social abilities into the RFC by restricting Plaintiff from work as part of a team but noted he would

18 be able to work in proximity to others.  (AR 24.)  The propriety of the ALJ interpreting limitations

19 opined by physicians and translating them to meaningful and concrete restrictions for purposes of

20 the RFC determination was considered in *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir.

21 2008).  There, the ALJ formulated an RFC restricting a claimant to simple, routine, and repetitive

22 sedentary work requiring no interaction with the public.  On appeal, the plaintiff argued that

23 restriction failed to adequately capture the deficiencies in pace and other mental limitations

24 described by two physicians. The court held the ALJ's RFC for simple, repetitive tasks was a

25 reasonable translation of the plaintiff's limitations in pace and other mild and moderate mental

26 limitations.  The court reasoned the ALJ was not required to adopt the exact language of the

27 limitations identified by the physicians.  *Id.*

28

Here, Dr. Garcia's notation that Plaintiff's emotional and behavioral problems would "impede" his ability to socialize with others and interact with co-workers was not a concrete limitation; it was a limitation the ALJ was required to interpret in the context of the record. The record reflects Plaintiff had some degree of limitation in socializing and interacting with others. In March 2011, Plaintiff reported to a treating physician that he did not socialize or go out in public because "he does not do well with other people." (AR 364.) Dr. Garcia reported Plaintiff appeared overly sensitive to remarks perceived as disrespectful or racist, and Plaintiff reported becoming easily angered. (AR 372.)

On the other hand, Plaintiff was able to sufficiently interact with the public and others at his numerous medical evaluations and examinations with Drs. Park, Yoo, Tran, Bella, Parmar, and Garcia; he interacted with therapists and counselors for mental health counseling at Oildale; and he participated in a course of physical therapy. There were no reports Plaintiff was unable to socialize or interact with any of these professionals or their respective staff personnel to receive care and treatment, although Plaintiff reportedly refused to wait for treatment on occasions and would leave if he could not be seen immediately upon his arrival. (AR 308.) In December 2010, he was observed to be pleasant at examination. (AR 348.) In May 2011, while it was noted Plaintiff was somewhat indifferent and apathetic, he demonstrated a fair resolve to participate in treatment. (AR 358.) In short, Plaintiff was able to sufficiently interact with others to obtain medical treatment and mental health counseling. Beyond his interactions with medical professionals, Plaintiff reported he enjoyed spending time with his girlfriend and sons, he lived with a roommate and his girlfriend without apparent problem, and he kept in contact with his mother frequently and his siblings occasionally. (AR 364, 368.) Taken as a whole, the record does not support an inability to socialize or interact with the public. The ALJ found Plaintiff unable to work on a team, but able to work in proximity to others. Interpreting Plaintiff's "impeded" social ability as a limitation to team work but not a complete preclusion from working in proximity to others or dealing with the public was reasonable and supported by substantial evidence. The ALJ did not reject Dr. Garcia's opinion, but formulated a limitation that was an appropriate interpretation of Dr. Garcia's opinion and was supported by sufficient evidence.

**3.     The ALJ's Consideration of Dr. Martin's Opinion**

Plaintiff argues Dr. Martin, a non-examining physician, specifically reviewed Dr. Garcia's examination findings and opined Plaintiff should be limited to "no public contact and a setting which did not have social interactions as a predominant requirement, limiting interpersonal contact to brief and superficial interactions."  (AR 380.)  The ALJ rejected this opinion reasoning that there is "no evidence [Plaintiff] would have difficulties interacting with the public."  (AR 29.)  Plaintiff argues this basis for rejecting Dr. Martin's opinion is not legally sufficient and is unsupported by substantial evidence.

As to Plaintiff's cognitive functioning, Dr. Garcia concluded Plaintiff had no deficits with regard to persistence, pace, or concentration, thus there was no basis to further limit Plaintiff to simple, repetitive tasks.   The Commissioner asserts the clinical findings are relatively unremarkable as to Plaintiff's mental limitations, and Plaintiff points to no other evidence in the record which supports Dr. Martin's opined limitation for simple, repetitive tasks.  However, even if Plaintiff should have been limited to simple, repetitive tasks, this error is not prejudicial because the work identified by the VE was limited only to simple work at reasoning level 2, which encompasses a limitation to simple, repetitive work.

The record reflects no evidence of an inability to deal with the public other than Plaintiff's own statements he did not enjoy going out in public and did not like dealing with people.  As discussed above, these statements are at odds with evidence showing Plaintiff was successfully able to interact with physicians, counselors, and their respective staffs to obtain treatment.  He was also able to maintain relationships with his family, his children, a girlfriend, and a roommate.  Moreover, Dr. Garcia's opinion that Plaintiff was socially "impeded" was not evidence of an inability to deal with the public.  In this regard, Dr. Martin's opinion that Plaintiff should be precluded from public contact at a job is not supported, and the ALJ did not err in rejecting Dr. Martin's opinion on this basis.

As for the limitation to simple, repetitive tasks opined by Dr. Martin, which Plaintiff argues should have been included in the RFC, the ALJ did not discuss the opined limitation or offer a basis to reject it.  However, even if the ALJ erred in failing to credit Dr. Martin's opinion in

1  this regard, Plaintiff has not demonstrated the error is prejudicial.  *McLeod v. Astrue*, 640 F.3d

2  881, 888 (9th Cir. 2010) (to justify further administrative proceedings, claimant must demonstrate

3  a substantial likelihood of prejudice; merely probability is not enough).  The VE identified jobs

4  Plaintiff could perform that require only level-2 reasoning skills (*see* DICOT 207.685-014,

5  photocopying-machine operator; DICOT 239.567-010, office helper), which is consistent with a

6  limitation to simple, repetitive work.  *See Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984-85 (C.D.

7  Cal. 2005).  Thus, even had the simple, repetitive job limitation been included in the RFC, it

8  would not have changed the availability of alternative work.

9  **B.     The ALJ Properly Credited the VE's Testimony Regarding a Sit/Stand Option**

10         Pursuant to the ALJ's RFC determination, Plaintiff must be given the option to alternate

11  between sitting and standing (a "sit/stand" option) as needed in up to 30-minute increments at any

12  job he performs.  Even with this limitation, the ALJ determined Plaintiff could perform "light"

13  exertional-level work based on the testimony of the VE, who opined such work would include a

14  sit/stand option.  The DOT, however, does not address a sit/stand option for any job it identifies.

15  Plaintiff argues the VE's testimony that jobs listed in the DOT can nevertheless be performed with

16  a sit/stand option is necessarily inconsistent with the DOT.  Plaintiff maintains the ALJ was

17  required to obtain a reasonable explanation to explain and justify the conflict, but the VE did not

18  explain the basis for the variance from the DOT job descriptions.  (Doc. 13, 7:16-8:9.)

19         At Step Five, the ALJ must determine whether there is alternative work the claimant can

20  perform in light of the claimant's RFC.  20 C.F.R. §§ 404.1520(f), 416.920(f).  In determining

21  whether appropriate jobs exist for the claimant, the ALJ generally will refer to the DOT.  *Light v.*

22  *Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997), Social Security Ruling ("SSR") 00-4p,

23  2000 WL 1898704 ("In making disability determinations, we rely primarily on the DOT

24  (including its companion publication, the SCO) for information about the requirements of work in

25  the national economy.").  In addition to the DOT, the ALJ may rely on the testimony of vocational

26  experts who testify about specific occupations a claimant can perform in light of his RFC.  20

27  C.F.R. § 404.1560(b)(2); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir.

28

2009).  SSR 00-4p provides the following guidance regarding occupational evidence from a VE in relation to information included in the DOT:

> Occupational evidence provided by a VE or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The ALJ may rely on VE testimony that contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.  *Light*, 119 F.3d at 793; *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995); *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  Although evidence provided by a VE "generally should be consistent" with the DOT, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict." SSR 00-4p at *2.  Thus, the ALJ must first determine whether a conflict exists, and if it does, the ALJ must then determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT.  *Id.* at *2-3.  Only after determining whether the VE has deviated from the DOT, and whether any deviation is reasonable, can an ALJ properly rely on the VE's testimony as substantial evidence to support a disability determination. *Massachi*, 486 F.3d at 1152-54.  Evidence sufficient to support a deviation from the DOT may be either specific findings of fact regarding Plaintiff's ability to perform particular jobs, or inferences drawn from the context of the expert's testimony.  *See Johnson*, 60 F.3d at 1435 n. 7 (ALJ provided sufficient support for deviation by noting that the VE described characteristics and requirements of jobs in the local area consistent with claimant's RFC); *Terry v. Sullivan*, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation where VE's understanding of applicable legal standards is clear from context).

District courts in this circuit are split as to whether there is a conflict between the DOT and VE testimony where the DOT is silent on a job requirement – i.e., a sit/stand option.  The majority of courts find that even though the DOT is silent as to this particular job requirement, a VE's testimony that certain work can be performed by a claimant with a need for a sit/stand option is not inconsistent.  *Edwards v. Colvin*, No. 2:13-cv-1461-DAD, 2015 WL 673441, at *4 (E.D. Cal. Feb. 17, 2015); *Gilmour v. Colvin*, No. 1:13-cv-0553-BAM, 2014 WL 3749458, at *8 (E.D. Cal. July 29, 2014); *Forrest v. Comm'r Soc. Sec. Admin.*, No. 14-5421, 2014 WL 6185309, at *4 (6th Cir. 2014) (unpublished) ("But the DOT does not discuss whether jobs have a sit/stand option . . . and therefore the vocational expert's testimony supplemented, rather than conflicted with, DOT job descriptions."); *Zblewski v. Astrue*, 302 Fed. Appx. 488, 494 (7th Cir. 2008) (unpublished) ("Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT."); *Stain v. Colvin*, No. CV 13-1973-SH, 2014 WL 2472312, at *2 (C.D. Cal. June 2, 2014).

At least three district courts in this circuit have concluded a VE's testimony that jobs could be performed with a sit/stand option is inconsistent with the DOT's silence on the matter. *Edwards v. Astrue*, 2013 WL 1891764, at *9-10 (N.D. Cal. May 6, 2013) (finding apparent conflict where VE testifies jobs can be performed with a sit/stand requirement and the DOT is silent about that requirement); *Valenzuela v. Astrue*, 2009 WL 1537876, at *3 (N.D. Cal. June 2, 2009) (same), *Smith v. Astrue*, No. C 09-03777-MHP, 2010 WL 5776060, at *11-12 (N.D. Cal. Sept. 16, 2010) (same).

Even assuming, without deciding, there is a conflict when the VE testifies that a person who requires a sit/stand option can perform work identified by the DOT, the ALJ did not err in resolving the conflict.  The ALJ posed a hypothetical to the VE including the sit/stand limitation and asked whether an individual would be able to perform any alternative work.  (AR 69.)  In posing this hypothetical, the ALJ acknowledged the DOT "does not discuss the sit/stand option," and asked whether there was anything in the VE's work history that gave him expertise to discuss jobs that provide a sit/stand option.  (AR 69.)  The VE responded as follows:

1    Yes, your honor.   I have been a vocational rehabilitation counselor for
approximately 24 years and I have completed hundreds of job analyses and I'm also
2    in constant convocation with my colleagues regarding this issue.

3    (AR 70.)  The VE then testified that a person who required a sit/stand option would be able to

4    perform work as a ticket seller, photocopy machine operator, and office helper.  (AR 70.)  The VE

5    explained his *specific experience*[4] in conducting hundreds of job analyses and conferring with his

6    colleagues regarding this particular issue to give testimony about the specific jobs the VE believed

7    a person with that limitation could perform.   (AR 70.)   Even assuming there was a conflict

8    between the VE testimony and the DOT, this testimony sufficiently identifies a reasoned basis

9    under SSR 00-4p and *Massachi*, 486 F.3d at 1153 to defer to the VE's testimony over the DOT's

10   silence on this issue.  The ALJ did not err in relying on the VE's testimony about the work that

11   could be performed even where a person requires a sit/stand option.

12   **C.      Subsequent Grant of Benefits Does Not Warrant Remand As New and Material
Evidence**
13

14        Plaintiff contends he was awarded SSI benefits on February 9, 2015, in a subsequent

15   decision which constitutes new and material evidence that requires remand.  Pursuant to *Luna v.*

16   *Astrue*, 623 F.3d 1032 (9th Cir. 2010), a subsequent award of benefits may create an ambiguity

17   and conflict with a prior non-disability finding.  Plaintiff acknowledges the subsequent disability

18   finding in *Luna* was issued only one day after a prior non-disability finding.  In Plaintiff's case, the

19   non-disability finding was made on January 10, 2013, and the subsequent grant of benefits

20   awarded disability as of October 30, 2014.   Even though the non-disability and subsequent

21   disability finding are not one day apart like *Luna*, Plaintiff argues the subsequent disability finding

22   is nonetheless potentially in conflict with the first non-disability finding made nearly two years

23   earlier.  Plaintiff asserts this is so because both his applications concern disability under SSI, and

24   the effective date of an SSI award may not, as a matter of law, predate the date of the SSI

25   application.  An award of disability under SSI does not necessarily correlate to the actual onset

26   date of the disability itself.   Thus, in considering Plaintiff's subsequent SSI application, the

27

28   [4] This testimony goes beyond the VE's curriculum vitae and status as a vocational expert generally.  This testimony
lays a specific foundation for the VE's testimony regarding the sit/stand limitation as applicable to the work identified.

1   Commissioner would not have considered whether Plaintiff actually became disabled before

2   October 30, 2014 (the date of Plaintiff's subsequent SSI application).  Plaintiff argues under these

3   circumstances, the existence of a subsequent disability finding for SSI purposes requires remand

4   so the ALJ can evaluate whether the records forming the basis of the subsequent disability finding

5   relate back to the time period relevant to Plaintiff's currently pending SSI claim – i.e., the claim

6   presently before the Court.

7       The Commissioner argues *Luna* is distinguishable and does not provided support for a *per*

8   *se* remand whenever there is a subsequent application and grant of benefits.   The courts are

9   required to address the assertions of error before it, regardless of whether the claimant satisfied the

10  statutory and regulatory burdens under a different application.  Plaintiff merely points to a generic

11  award letter on a subsequent SSI claim and provides no information for a court to determine

12  whether the subsequent award had a reasonable possibility of changing the outcome of the first

13  decision, which is necessary to find that the evidence is material.  Moreover, even if *Luna* were

14  applicable, Plaintiff's subsequent disability starting on October 30, 2014, is not at or near the time

15  of the date of the non-disability finding in January 2013.  As such, the subsequent disability

16  finding does not create any conflict or ambiguity with the January 2013 decision that must be

17  resolved.

18      Pursuant to 42 U.S.C. § 405(g), "[t]he court may, . . . at any time order additional evidence

19  to be taken before the Commissioner of Social Security, but only upon a showing that there is new

20  evidence which is material and that there is good cause for the failure to incorporate such evidence

21  into the record in a prior proceeding."  New evidence is considered "material" when it "'bear[s]

22  directly and substantially on the matter in dispute,' and if there is a 'reasonabl[e] possibility that

23  the new evidence would have changed the outcome of the  . . . determination.'"  *Bruton v.*

24  *Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (quoting *Booz v. Sec'y of Health & Human Servs.*,

25  734 F.2d 1378, 1380 (9th Cir. 1984)).

26      In *Luna,* Carmen Luna, the claimant, applied for DIB and SSI alleging an onset date of

27  November 30, 2002.  After her application was denied, she requested a hearing before an ALJ and

28  amended her alleged disability onset date to March 26, 2003.  The ALJ denied Luna's application

in January 2006, the Appeals Council denied Luna's request for review, and Luna then filed a complaint in district court.  While this application was pending on appeal, Luna filed a second application for DIB and SSI, which was granted in August 2007.  On the second application, Luna was found disabled as of January 28, 2006, which was one day after the ALJ found Plaintiff not disabled for purposes of her first application.  On appeal to the district court as it pertained to Luna's first application, the parties agreed the matter should be remanded to the agency to reconcile the denial of benefits based on Luna's first application with the grant of benefits on her second application, but they did not agree to the terms of the remand.  Luna argued the second application grant clearly indicated she was disabled for the earlier time period covered by the first application, so the proper remedy was a remand for payment of benefits for the earlier time period. The district court instead granted the Commissioner's motion to remand for further administrative proceedings to determine whether Luna was actually disabled during the period of time relevant to her first application.  Luna appealed that determination.

The appellate court affirmed a remand for further proceedings reasoning finding there was a reasonable possibility that the subsequent grant of benefits was based on new evidence not considered by the ALJ as part of the first application, and further consideration of those factual issues was appropriate to determine whether the decision on the first application should be different.  The court distinguished the need for further proceedings from *Bruton v. Massanari*, which also involved a subsequent grant of benefits while an initial application was pending on appeal.  In *Bruton*, the court held the initial denial and subsequent award of benefits were easily reconcilable on the record before the court, and no remand was warranted.  The second application in *Bruton* involved different evidence, a different time period, and a different age classification, which the court found distinguishable from *Luna*.  In *Luna*, the court only had a Notice of Award letter with a one-day difference between the non-disability finding and the disability finding. Because the evidence was limited in this way, the court reasoned Luna may have "presented different medical evidence to support the two applications, or there might be some other reason to explain the change."  *Luna*, 623 F.3d at 1035.  With this uncertainty, a remand for further factual proceedings was determined to be the appropriate remedy.  *Id.*

This case is distinguishable from *Luna.*  Here, there is a 658-day difference (nearly two years) between the two disability determinations whereas in *Luna* the date difference between the disability determinations was only one day.[5]  Although, like *Luna*, Plaintiff has submitted only the Notice of Award letter on the subsequent decision and not the decision showing the reasoning of the ALJ or a summary of the evidence considered in conjunction with the subsequent application, the lack of temporal proximity of the disability and non-disability is a critical distinction from *Luna*.  The *Luna* court expressly agreed with *Bradley v. Barnhart*, 463 F. Supp. 2d 577, 580-81 (S.D.W. Va. 2006) that "in certain circumstances, an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim."  Here, there is no "immediate proximity."  Without such proximity, the "reasonable possibility" that the subsequent disability finding was based on evidence both new and material to the first decision is substantially diminished.  Although Plaintiff argues the temporal proximity *potentially* could have been closer had the subsequent application involved a DIB claim rather than one for SSI, this contention is only speculation and does not equate to a reasonable possibility.  Plaintiff does not describe the evidence considered in conjunction with the subsequent application or even submit the second decision to the Court; Plaintiff only offers the Notice of Award letter for consideration.  It is Plaintiff's burden to establish the materiality of new evidence – i.e., that the new evidence has a reasonable probability of changing the outcome.  42 U.S.C. § 406(g).  This burden has not been satisfied by a Notice of Award letter in a subsequent determination finding disability nearly two years after the period in which Plaintiff was determined not disabled.

**D.     The ALJ Failed to Offer Clear and Convincing Reasons to Discredit Plaintiff**

Plaintiff contends the ALJ provided no specific reasons for finding Plaintiff not fully credible.  Rather, the ALJ only noted a few activities in which Plaintiff participates that are not relevant to Plaintiff's alleged impairments, and this is insufficient to meet the clear and convincing

---

[5] On Plaintiff's first application for SSI, Plaintiff was found **not disabled** between February 2010 and January 10, 2013, and on the second application Plaintiff was found disabled as of October 30, 2014.

standard.   The Commissioner responds Plaintiff's daily activities were just one of the ample reasons the ALJ discussed in finding Plaintiff not fully credible, all of which are supported by substantial evidence.

### 1.    Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light*, 119 F.3d at 792.

### 2.    Plaintiff's Lay Statements Regarding Physical Pain and Mental Symptoms

The ALJ first summarized Plaintiff's hearing testimony and then concluded that Plaintiff's statements concerning intensity, persistence, and the limiting effects of his symptoms were not entirely credible.   The ALJ then proceeded to summarize various portions of the medical record

24

1  and treatment history.  This summary was not an analysis, but a recitation of the facts.  In

2  discussing treatment in December 2011, the ALJ noted that Plaintiff "did not seek out mental

3  health treatment after December 2011, which suggests that [Plaintiff's] symptoms may not be as

4  severe as alleged."  (AR 28.)  Finally, the ALJ concluded with the following discussion of the

5  evidence:

> In sum, the above residual functional capacity assessment is supported by
> substantial weight of the objective evidence that shows degenerative disc disease
> with radicular symptoms, but an ability to perform heel and toe walking,
> independent ambulation as well as intact motor strength and reflexes (Exs. 3F, 7F,
> 9F, 18F, 19F, 20F).  In addition, the claimant acknowledges an ability to lift 20
> pounds and he has been able to exercise (Ex. 18F, testimony).  Further, in 2012, he
> reported good pain control with medication (Ex. 18F).  Lastly, the claimant did not
> seek out mental health treatment after December 2011, which suggests that his
> symptoms are not particularly bothersome.

12  (AR 29.)   Under the Ninth Circuit's recent decisions in *Garrison v. Colvin*, 759 F.3d 995 (9th Cir.

13  2014) and *Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014), this discussion is not sufficiently tied

14  to consideration of Plaintiff's credibility and does not reach the clear and convincing level of

15  reasoning necessary to support an adverse credibility finding.  The Commissioner's argument

16  relies primarily on post-hoc reasoning which the Ninth Circuit has explained cannot be used to

17  support the ALJ's determination.  *Burrell*, 775 F.3d at 1138 ("Our decisions make clear that we

18  may not take a general finding – an unspecific conflict between [the claimant's] testimony about

19  daily activities and her reports to her doctors – and comb the administrative record to find specific

20  conflicts.").

21      The Commissioner contends the ALJ found Plaintiff's missed counseling appointments an

22  adverse credibility factor.  The ALJ's mere observation of missed appointments, however, was not

23  accompanied by any analysis or indication the ALJ considered this as a credibility factor.  The

24  Commissioner also notes the ALJ recounted Plaintiff's treatment, which the Commissioner

25  construes as "conservative," that Plaintiff failed to follow through with recommended treatment,

26  and Plaintiff reported normal physical activities to his physician on at least one occasion.  The

27  ALJ did not articulate these reasons as a basis to discount Plaintiff's credibility.  A decision that

28  merely records facts – such as missed appointments or the types and nature of treatment obtained –

1    without any analysis of those facts does not constitute a specific, clear, and convincing basis to

2    support a credibility finding.  In *Burrell*, 775 F.3d at 1138, the ALJ decision noted no record of

3    primary care for headaches, neck, or back pain.  The Commissioner argued the ALJ found the

4    claimant's testimony about her headaches contradicted by the record, which showed she had no

5    treatment for headaches.  The court rejected this argument on two grounds: (1) the ALJ never

6    discussed a conflict with the medical record as a basis for the adverse credibility determination

7    and the mere notation for a lack of treatment for headaches was not a credibility analysis; and (2)

8    four different medical records showed reports of headaches and neck pain.

9        Similar to *Burrell*, the ALJ did not predicate the adverse credibility finding on Plaintiff's

10   missed appointments, his refusal to seek recommended treatment, or what the Commissioner

11   characterizes as conservative treatment. Rather, Plaintiff's missed appointments were merely

12   noted; the ALJ made no finding what the missed appointments implied.  Also, the ALJ only

13   recorded Plaintiff's treatment but did not characterize it as "conservative" or explain how the

14   treatment was so minor that it undercut Plaintiff's lay statements.  While the Court may make

15   inferences regarding the ALJ's reasoning, it cannot infer an entire credibility analysis where there

16   is none.  *See Burrell*, 775 F.3d at 1138.

17       The Commissioner contends the ALJ considered Plaintiff's daily activities as a credibility

18   consideration.  Like *Burrell*, the daily activities noted by the ALJ are not analyzed – how or why

19   these activities were considered relevant by the ALJ is not discussed.  Specifically, the ALJ noted

20   only that Plaintiff "reported that he gets up in the morning, gets help getting dressed, does some

21   light dusting, watches television, reads, and uses three-pound hand weights.  He does not vacuum

22   or sweep, cook, do dishes, grocery shop, do yard work, do hobbies, or use a computer."  (AR 24.)

23   In *Burrell*, the appellate court found the ALJ's failure to elaborate which daily activities conflicted

24   with a specific portion of Plaintiff's testimony rendered the reasoning not sufficiently specific to

25   satisfy the clear and convincing standard.  Pursuant to *Burrell*, the mere mention of certain daily

26   activities in the ALJ's decision without any analysis is insufficient support for an adverse

27   credibility determination.

28

The decision reflects the ALJ noted Plaintiff's statements of pain and physical limitation, but apparently rejected the extent of these statements.  Plaintiff testified he experiences constant pain and while medication relieves the pain to some extent, the pain remains constant at approximately 5 out of 10.  Plaintiff also stated he cannot stand for more than 5 minutes, walk for more than 20, or sit for more than 10 minutes due to pain.  The ALJ necessarily rejected these statements in finding that Plaintiff remained able to perform light work, which requires a person to lift 20 pounds occasionally, and 10 pounds frequently, and light work also requires "a good deal of walking or standing."   The Commissioner argues the ALJ rejected these statements because Plaintiff reported good pain relief with medication.  Even assuming this reasoning was sufficiently tied to an actual credibility analysis rather than general support for the RFC, the reasoning is not clear and convincing because it is not supported by substantial evidence.

The record reflects Plaintiff consistently reported pain even with medication.  In 2009, Plaintiff complained of back pain and was given a prescription for Soma and Vicodin and referred to physical therapy.  (AR 309.)  He was referred to pain management, but the ALJ noted Plaintiff kept leaving before the appointments if he could not be seen immediately.   (AR 308.)  Nevertheless, in April 2010, Plaintiff was seen for pain management, where he reported his pain ranged from a 4 to an 8 on a 10-point scale.  (AR 315.)  In September 2010, Plaintiff was seen again for refills of his pain medication, and he was sent for another pain management consultation that took place in December 2010.  (AR 347.)  Plaintiff rated his pain as an 8 to 10 in intensity, describing it as constant, aching, throbbing, and burning in nature.  (AR 347.)  During a pain management appointment in 2011, Plaintiff reported his back pain was decreased to a 4 or 5 out of 10 with medication.  In December 2011, Plaintiff indicated his pain remained between a 7 or an 8 out of 10, but Lortab brought the pain down to a 4 or a 5 out of 10.  (AR 412.)  In February 2012 Plaintiff reported his pain was currently an 8 out of 10, but Lortab gave him "fairly good pain relief."  (AR 410.)  Plaintiff also reported taking Soma, which also provided "good pain relief." (AR 410.)  In April 2012, Plaintiff again reported pain as a 6 out of 10 (AR 409), but in July 2012 reported experiencing persistent spasms over the previous months before the examination with an intensity of 9 or 10 out of 10.  (AR 442.)

Although Plaintiff reported reduced pain with medication, he never rated his pain as less than a 5 out of 10 to his doctors and explained at the hearing his back pain was constant and while the medication "helps alleviate" the pain, it was never gone.  (AR 61.)  Without medication, his pain was at a 9 or a 10 out of 10, but with the medication he can "do a five sometimes" in terms of pain.  (AR 61.)  When viewing the record as a whole, Plaintiff's few isolated reports of pain reduction with medication is not a clear and convincing reason to discount Plaintiff's pain testimony, especially in view of Plaintiff's hearing testimony that while the pain was lessened with medication it was still significant and constant.

The Commissioner argues that as part of the credibility determination, the ALJ considered the medical opinions of record, which did not support the extent of limitation Plaintiff alleged. While the ALJ noted the RFC was supported by the weight of the medical information, the ALJ did not reason Plaintiff's pain testimony was rejected on that basis.  However, even if such reasoning could be inferred from the decision, lack of corroborating medical evidence must be considered in conjunction with other credibility factors and may not serve as the sole basis to reject pain testimony.  Here, all other reasoning the Commissioner asserts the ALJ articulated are either insufficient or reasoning that was not offered by the ALJ at all.  Thus, inconsistency with the medical evidence remains as the only basis to reject Plaintiff's physical pain testimony – which is insufficient.

As to his mental health symptoms, the ALJ noted Plaintiff did not seek out mental health after December 2011, suggesting that his psychological symptoms were not "particularly bothersome."  (AR 29.)  Even assuming this was a legally sufficient basis to reject Plaintiff's lay testimony about his mental health symptoms, the credibility analysis as to Plaintiff's subjective pain testimony is not clear and convincing and requires remand.

The Commissioner has aptly demonstrated there may be substantial evidence to support an adverse credibility determination on several grounds; therefore, remand for further consideration is warranted rather than crediting Plaintiff's pain testimony as true.  *Burrell*, 775 F.3d at 1141 (where "evidence in th[e] record not discussed by the ALJ suggests that [the claimant] may not be credible," the proper remedy is remand rather than application of the credit-as-true doctrine).

1

**CONCLUSION AND RECOMMENDATION**

2      Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

3 evidence and therefore RECOMMENDS that the ALJ's decision be REVERSED and

4 REMANDED for further administrative proceedings and that judgment be entered for Plaintiff and

5 against Carolyn W. Colvin, Acting Commissioner of Social Security.

6      These findings and recommendations are submitted to the district judge assigned to this

7 action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen

8 (14) days of service of this recommendation, any party may file written objections to these

9 findings and recommendations with the Court and serve a copy on all parties.  Such a document

10 should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

11 district judge will review the magistrate judge's findings and recommendations pursuant to

12 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the

13 specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d

14 1153 (9th Cir. 1991).

15

16 IT IS SO ORDERED.

17 Dated:   __January 8, 2016__                    _____/s/ Sheila K. Oberto__
                                           UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28